J-A13032-25

2025 PA Super 143

COMMONWEALTH OF PENNSYLVANIA : IN THE SUPERIOR COURT OF
: PENNSYLVANIA
:
:
v. :
:
:
:
TREVOR JOEL BLOOM :
:
Appellant : No. 866 WDA 2024

Appeal from the Judgment of Sentence Entered February 12, 2024
In the Court of Common Pleas of Clearfield County Criminal Division at
No(s): CP-17-CR-0000062-2023

BEFORE: BOWES, J., OLSON, J., and BENDER, P.J.E.

OPINION BY BENDER, P.J.E.: **FILED: July 10, 2025**

Appellant, Trevor Joel Bloom, appeals from the judgment of sentence of 6 to 12 years' incarceration, imposed after he was convicted by a jury of drug delivery resulting in death (DDRD), 18 Pa.C.S. § 2506(a), delivery of a controlled substance, 35 P.S. § 780-113(a)(30),[1] and recklessly endangering another person (REAP), 18 Pa.C.S. § 2705. After careful review, we affirm.

---

[1] Appellant refers to this offense as possession with intent to deliver (PWID), which is also encompassed by section 780-113(a)(30). **See** 35 P.S. § 780-113(a)(30) ("Except as authorized by this act, the manufacture, **delivery**, **or possession with intent to manufacture or deliver**, a controlled substance by a person not registered under this act, or a practitioner not registered or licensed by the appropriate State board, or knowingly creating, delivering or possessing with intent to deliver, a counterfeit controlled substance.") (emphasis added). However, the criminal complaint makes it clear that Appellant was charged with delivery of a controlled substance. **See** Criminal Complaint, 1/19/23, at 2 ("The defendant did deliver/provide the victim with Fentanyl, being a Schedule II Controlled Substance."). Thus, we refer to this offense as delivery of a controlled substance, rather than PWID.

Appellant's convictions stem from evidence that on December 21, 2021, he provided heroin containing Fentanyl to Lindsey LaBorde ("the victim"), who then died from an accidental overdose of that drug. Appellant (an admitted long-time heroin user) and the victim (who allegedly had never used heroin before the night she died), lived together. On December 21, 2021, the victim complained to Appellant that she had a headache. Appellant "cut a very small line of heroin and told her she might want to take it if she wanted to feel better." Appellant's Brief at 7. Appellant then left the room and was gone "for about 20 minutes. When he came back…, he found [the victim] slumped on the couch. He placed her on the floor while attempting to resuscitate her." *Id.* at 7-8 (citations omitted). Appellant called 911, and police and paramedics arrived at the scene. The victim was subsequently pronounced dead. After toxicology testing showed a large quantity of Fentanyl in her blood, her cause of death was ruled to be an accidental overdose.[2]

Approximately one year later, Appellant was charged with the above-stated offenses, as well as involuntary manslaughter, 18 Pa.C.S. § 2504(a). He proceeded to a jury trial in December of 2023. At the close thereof, the jury convicted him of all charges except for the involuntary manslaughter count. On February 12, 2024, the court sentenced Appellant to the aggregate term set forth *supra*. He filed a timely post-sentence motion, and the

---

[2] We note that, although Appellant refers to the line of drugs he laid out for the victim as heroin, he does not dispute that those drugs could have contained Fentanyl.

- 2 -

Commonwealth also filed a motion for reconsideration of Appellant's sentence, arguing that a lengthier term was warranted. On July 8, 2024, the court denied both parties' motions.

Appellant filed a timely notice of appeal, and he and the court complied with Pa.R.A.P. 1925. Herein, Appellant raises four issues for our review:

> 1) Where there was insufficient evidence that Appellant gave a controlled substance to the [victim] and that he had no intention of giving her same, was the evidence insufficient as a matter of law to prove either the [DDRD] charge or the crime of [delivery of a controlled substance]?
>
> 2) Where the Commonwealth did not present a witness who analyzed the blood of the [victim], thereby denying the right to cross-examine that analyst, yet the lower court permitted the Medical Examiner to rely on this toxicology report, was it error to permit that expert to testify as to the results of that report, which formed the sole basis for opining that the cause of death was the ingestion of [F]entanyl?
>
> 3) Where the Comment to Pa.R.E[]. 703 reflects that when an expert relies on the report of another that was otherwise inadmissible, did the lower court err and compound the error raised in the preceding question, by not instructing the jury that it could not consider those facts as substantive evidence?
>
> 4) Where there were significant mitigating factors presented to the lower court at the time of sentencing[,] the court considered an improper factor when imposing [Appellant's] sentenc[e,] and the court provided no sentencing rationale whatsoever, should this Court vacate the sentence and remand for resentencing?

Appellant's Brief at 3-4.

## First Issue

Appellant first challenges the sufficiency of the evidence.

"Whether the evidence was sufficient to sustain the charge presents a question of law." *Commonwealth v. Toritto*, 67 A.3d 29 (Pa. Super. 2013) (*en banc*). Our standard of review is *de*

- 3 -

*novo*, and our scope of review is plenary. ***Commonwealth v. Walls***, 144 A.3d 926 (Pa. Super. 2016). In conducting our inquiry, we examine[,]

> whether the evidence at trial, and all reasonable inferences derived therefrom, when viewed in the light most favorable to the Commonwealth as verdict-winner, [is] sufficient to establish all elements of the offense beyond a reasonable doubt. We may not weigh the evidence or substitute our judgment for that of the fact-finder. Additionally, the evidence at trial need not preclude every possibility of innocence, and the fact-finder is free to resolve any doubts regarding a defendant's guilt unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. When evaluating the credibility and weight of the evidence, the fact-finder is free to believe all, part or none of the evidence. For purposes of our review under these principles, we must review the entire record and consider all of the evidence introduced.

> ***Commonwealth v. Trinidad***, 96 A.3d 1031, 1038 (Pa. Super. 2014) (quotation omitted).

***Commonwealth v. Rojas-Rolon***, 256 A.3d 432, 436 (Pa. Super. 2021).

Here, Appellant avers that the evidence failed to prove he committed DDRD or delivery of a controlled substance. A person commits DDRD

> if the person intentionally administers, dispenses, delivers, gives, prescribes, sells or distributes any controlled substance or counterfeit controlled substance in violation of section 13(a)(14) or (30) of the act of April 14, 1972 (P.L. 233, No. 64), known as The Controlled Substance, Drug, Device and Cosmetic Act, and another person dies as a result of using the substance.

18 Pa.C.S. § 2506(a) (footnote omitted). We have stated that this crime "consists of two principal elements: (i) [i]ntentionally administering, dispensing, delivering, giving, prescribing, selling or distributing any controlled substance or counterfeit controlled substance and (ii) death caused

- 4 -

by ('resulting from') the use of that drug." ***Commonwealth v. Kakhankham***, 132 A.3d 986, 991-92 (Pa. Super. 2015) (footnote omitted).

Additionally,

[t]he offense of delivery of a controlled substance is provided for in section 780–113(a)(30) of The Controlled Substance, Drug, Device and Cosmetic Act, (the "Act"). According to that section, the offense occurs in the following circumstances:

Except as authorized by this act, the manufacture, delivery, or possession with intent to manufacture or deliver, a controlled substance by a person not registered under this act, or a practitioner not registered or licensed by the appropriate State board, or knowingly creating, delivering or possessing with intent to deliver, a counterfeit controlled substance.

35 P.S. § 780–113(a)(30). The term delivery, as used in this section, is defined by the Act as "the actual, constructive, or attempted transfer from one person to another of a controlled substance, other drug, device or cosmetic whether or not there is an agency relationship." 35 P.S. § 780–102. Thus, for a defendant to be liable as a principal for the delivery of a controlled substance there must be evidence that he knowingly made an actual, constructive, or attempted transfer of a controlled substance to another person without the legal authority to do so.

***Commonwealth v. Murphy***, 844 A.2d 1228, 1233–34 (Pa. 2004) (footnote and one citation omitted).

In this case, Appellant argues that the evidence was insufficient to prove either of these crimes because, although he gave a line of heroin/Fentanyl to the victim, he claims that it was a "joke," and he did not intend for her to actually use the drugs. Appellant's Brief at 17. He also contends that it was unclear whether the victim ingested the drugs that he gave her. Appellant stresses that he left the room before she did so, and when he and police

officers were in the room later and he "wiped his hand on top of the cigar box where [the] substance was supposedly laid out," they "could see powder flying in the air[,]" indicating the victim had not ingested the line of drugs put there by Appellant. *Id.* at 18. Regarding the drug-delivery charge, Appellant also insists that the victim was the one who "would often purchase these drugs and/or possess them and try to dole them out to [Appellant,]" and, thus, the only drug delivery "may have been from [the victim] to [Appellant]." *Id.* at 19.

Appellant's arguments are unconvincing. The trial court aptly explained how the evidence in this case sufficiently supported the jury's verdict, as follows:

> Here, the court believes that the Commonwealth presented more than adequate [evidence] to prove the [Appellant] committed the offense of [DDRD]. At trial[,] evidence was presented that [Appellant] made a "line for [the victim] to use the Fetanyl [*sic*] because of a headache." Officer [Zachary] Cowan testified that [Appellant] related that he put out a quarter of a stamp bag for [the victim] and he even drew a line depicting the amount that he provided to her. In fact, [Appellant] drew the line twice to describe how much he gave [the victim,] and each time, they were the same length. There was also testimony that [Appellant] knew "everything you get these days is essentially Fetanyl [*sic*]. That it is either laced with Fetanyl [*sic*] or straight Fetanyl [*sic*], but you are not really getting heroin anymore." There was also testimony during trial that [the victim] was pronounced dead on December 21, 2021. Dr. [Harry] Kamerow[, an expert pathologist who conducted the autopsy of the victim,] testified that the toxicology report showed that [the victim] had "30 times the upper limit of therapeutic" [F]entanyl in her system, which he stated was a lethal concentration. He explained that the cause of death was "accidental overdose" and more specifically, a "Fetanyl [*sic*] overdose."

This [c]ourt believes that this evidence presented at trial by the Commonwealth proved each element of [DDRD] beyond a reasonable doubt. [Appellant] stated that he put out a "line" for [the victim] to use. His statements tend to prove that he intentionally provided the [F]entanyl to [the victim]. He was able to show the officer the amount that he provided and even stated that he put it out specifically for her. Providing the [F]entanyl to [the victim] is a violation of the Controlled Substance act, as he delivered a controlled substance to [the victim]. Lastly, the cause of death was a "[F]entanyl overdose," which satisfies the element that [the victim] died because of the [F]entanyl that was provided to her by [Appellant].

\*\*\*

[Appellant] argues that [the victim] could have ingested Fentanyl from another source. However, just because [Appellant] puts forth another possibility, that does not overcome the jury's verdict that [Appellant] was guilty on the charge.

[Appellant] also moves for Judgment of Acquittal on the charge of [delivery of a controlled substance,] alleging that the evidence was insufficient. For the reasons stated above, the court believes the Commonwealth's evidence at trial was sufficient to prove each element of the charge of [delivery].... ... [Appellant] did state that he put the [F]entanyl out for [the victim] to use, thereby delivering the [F]entanyl to [the victim, and] there is no argument that [Appellant] is not a person registered to deliver that controlled substance.

Trial Court Opinion (TCO), 9/30/24, at 4-5 (unnecessary capitalization omitted; some formatting altered).

We agree with the trial court's rationale. We add that Appellant's claim that he did not intend for the victim to **actually use** the drugs he gave her does not invalidate his DDRD conviction. The evidence clearly established that Appellant **intentionally gave** heroin/Fentanyl to the victim; whether he intended for her to **use** those drugs is irrelevant to sustaining his DDRD conviction. **See Kakhankham**, 132 A.3d at 991-92 (stating that DDRD

merely requires "***intentionally*** … ***dispensing, delivering, [or] giving*** … any controlled substance" to a person that ultimately causes their death) (emphasis added).

We also briefly address Appellant's argument that the police could "see powder flying in the air" when he wiped his hand over the cigar box where he had laid out a "miniscule amount" of Fentanyl and, thus, "there is no evidence that [the victim] took the supposed line that [Appellant] had put out for her." Appellant's Brief at 18. Appellant contends that in this regard, "the Commonwealth presented evidence of both innocence and guilt[,]" ***id.***, and

> [w]hen two equally reasonable and mutually inconsistent inferences can be drawn from the same set of circumstances, a jury must not be permitted to guess which inference it will adopt, especially when one of the two guesses may result in depriving a defendant of his life or his liberty. When a party on whom rests the burden of proof in either a criminal or a civil case, offers evidence consistent with two opposing propositions, he proves neither.

***Id.*** at 19 (quoting ***Commonwealth v. Woong Knee New***, 47 A.2d 450, 468 (Pa. 1946)).

We disagree with Appellant's suggestion that it was equally reasonable to infer that the victim did not take the line of drugs provided by Appellant. Appellant claims that Officer Cowen, who was present at the scene, testified that he was "not sure" if the line of drugs "was still there or not." ***Id.*** at 8. However, on the page of testimony cited by Appellant to support this claim, Officer Cowan had the following exchange with the prosecutor:

> [The Commonwealth:] Okay. And so [Appellant] showed you where he cut the line. Was the line still on that?

> [Officer Cowan:] ***There was residue from it.*** That is what he swiped on the floor.
>
> [The Commonwealth:] Okay. But there was ***not*** a line actually present.
>
> [Officer Cowan:] ***Not that I believe.***

N.T. Trial, 12/18/23-12/20/23, at 86 (emphasis added). Officer Cowan did not say that he was "not sure" if the line of drugs was gone, as Appellant claims; instead, the officer testified that he believed the line ***was*** gone and that Appellant only swiped away ***residue*** left from that line.

In sum, viewing the evidence in the light most favorable to the Commonwealth as the verdict winner, we agree with the trial court that it was reasonable for the jury to infer that the Fentanyl in the victim's system was from the drugs provided by Appellant, and that the victim died from ingesting those drugs. Thus, the evidence was sufficient to support Appellant's convictions for DDRD and delivery of a controlled substance.

## Second Issue

Next, Appellant challenges the trial court's permitting Dr. Kamerow to testify about the toxicology report he used to determine the victim's cause of death, where Appellant had no opportunity to cross-examine the toxicologist who tested the victim's blood samples and drafted the report. According to Appellant, the Commonwealth's position on the admissibility of Dr. Kamerow's testimony rested on Pennsylvania Rule of Evidence 703, which states:

> An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed. If experts in the particular field would reasonably rely on those kinds

of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted.

Pa.R.E. 703. However, the comment to the rule states, in pertinent part, that "[a]n expert witness cannot be a mere conduit for the opinion of another." Pa.R.E. 703 Cmnt. Here, Appellant insists that Dr. Kamerow was merely a conduit for admitting the opinion of the toxicologist. Appellant contends that admitting the toxicology report without permitting him to cross-examine the toxicologist violated his right to confront the witnesses against him under both the Sixth Amendment of the United States Constitution, and Article 1, Section 9 of the Pennsylvania Constitution.[3]

In analyzing Appellant's argument, we begin by acknowledging that "[t]he issue of whether a defendant was denied his right to confront a witness under the confrontation clause of the Sixth Amendment is a question of law for which our standard of review is *de novo* and our scope of review is plenary." ***Commonwealth v. Milburn***, 72 A.3d 617, 618 (Pa. Super. 2013) (citation and internal quotation marks omitted). Additionally, the United States Supreme Court has explained that

> [t]he Sixth Amendment's Confrontation Clause guarantees a criminal defendant the right to confront the witnesses against him. The Clause bars the admission at trial of "testimonial statements" of an absent witness unless she is "unavailable to testify, and the defendant ha[s] had a prior opportunity" to cross-examine her. ***Crawford v. Washington***, 541 U.S. 36, 53–54 … (2004). And that prohibition applies in full to forensic evidence. So a

---

[3] Although Appellant mentions the Pennsylvania Constitution, he does not develop a separate argument that his rights under our Constitution were violated. Thus, we likewise limit our analysis to the confrontation rights provided by the Sixth Amendment of the United States Constitution.

prosecutor cannot introduce an absent laboratory analyst's testimonial out-of-court statements to prove the results of forensic testing. *See Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 307, 329 … (2009).

*Smith v. Arizona*, 602 U.S. 779, 783 (2024).

Appellant relies heavily on *Smith* to support his argument that Dr. Kamerow's testimony regarding the toxicology report violated his Confrontation Clause rights. In *Smith*, the Court addressed the application of Confrontation Clause "principles to a case in which an expert witness restate[d] an absent lab analyst's factual assertions to support his own opinion testimony." *Id.* The *Smith* Court began by noting that,

> [t]he Confrontation Clause provides that "[i]n all criminal prosecutions, the accused shall enjoy the right … to be confronted with the witnesses against him." In operation, the Clause protects a defendant's right of cross-examination by limiting the prosecution's ability to introduce statements made by people not in the courtroom.

*Id.* at 783-84.

The Court clarified, however, that "[t]he Clause's prohibition 'applies only to testimonial hearsay' — and in that two-word phrase are two limits." *Id.* at 784 (citing *Davis v. Washington*, 547 U.S. 813, 823 (2006)). "First, in speaking about 'witnesses' — or 'those who bear testimony' — the Clause confines itself to '***testimonial*** statements'…." *Id.* (citations omitted; emphasis added).

> Second…, the Clause bars only the introduction of hearsay — meaning, out-of-court statements offered to prove the truth of the matter asserted. When a statement is admitted for a reason unrelated to its truth, we have held, the Clause's role in protecting the right of cross-examination is not implicated. That is because

- 11 -

the need to test an absent witness ebbs when her truthfulness is not at issue.

***Id.*** at 785 (cleaned up).

The ***Smith*** Court then explained how its prior decisions "made clear that the Confrontation Clause applies to forensic reports." ***Id.*** Namely,

> [i]n ***Melendez-Diaz***…, state prosecutors introduced "certificates of analysis" (essentially, affidavits) stating that lab tests had identified a substance seized from the defendant as cocaine. But the State did not call as witnesses the analysts who had conducted the tests and signed the certificates. We held that a straightforward application of ***Crawford*** showed a constitutional violation. The certificates were testimonial: They had an evidentiary purpose, identical to the one served had the analysts given live, in-court testimony. And the certificates were offered to prove the truth of what they asserted: that the seized powder was in fact cocaine. So the defendant had a right to cross-examine the lab-analyst certifiers. In reaching that conclusion, we rejected the State's claim that the results of so-called neutral, scientific testing should be subject to a different rule. We again underscored that the Confrontation Clause commanded not reliability but one way of testing it — through cross-examination. And we thought that method might have plenty to do in cases involving forensic analysis. After all, lab tests are not uniquely immune from the risk of manipulation or mistake. The defendant might have used cross-examination to probe what tests the analysts performed, whether those tests presented a risk of error, and whether the analysts had the right skill set to interpret their results.
>
> Two years later, the Court relied on ***Melendez-Diaz*** to hold that a State could not introduce one lab analyst's written findings through the testimony of another. In ***Bullcoming v. New Mexico***, 564 U.S. 647, 651–652 … (2011), an analyst tested the blood-alcohol level of someone charged with drunk driving, and prepared a testimonial certification reporting that the level was higher than legal [blood alcohol levels]. But by the time the driver's trial began, that analyst had been placed on unpaid leave. So the State instead called a different analyst from the same lab to testify as to what the certification said. The substitute analyst had similar qualifications, and knew about the type of test performed. But the Court held that insufficient to satisfy the

Confrontation Clause. The surrogate testimony, the Court explained, could not convey what the certifying analyst knew or observed about the particular test and testing process he employed. Nor could that testimony expose any lapses or lies on the certifying analyst's part, or offer any insight into whether his leave-without-pay was the result of misconduct. Concluded the Court: "[W]hen the State elected to introduce [the] certification," its author — and not any substitute — "became [the] witness [that the defendant] had the right to confront."

*Smith*, 602 U.S. at 785-86 (cleaned up).

Given this legal backdrop, the **Smith** Court assessed Smith's challenge to the trial court's admission of testimony by Greggory Longoni, a forensic scientist with the Arizona Department of Public Safety (DPS), about drug testing performed by a different scientist, Elizabeth Rast, who had been previously employed by DPS and who had conducted tests on suspected drugs found in Smith's possession. *Id.* at 789-90. "Longoni prepared for trial by reviewing Rast's report and notes" and when he "took the stand, he referred to those materials and related what was in them, item by item." *Id.* at 791. Longoni also explained the methods Rast had used to analyze the substances, and the lab's policies and practices, before offering his "independent opinion" that the items submitted for testing were "usable quantities" of various drugs, including methamphetamine, marijuana, and cannabis. *Id.*

After Smith was convicted, he argued on appeal that Longoni's testimony violated his Confrontation Clause rights, as the "real witness against him … was Rast" and "he had not had the opportunity to cross-examine her." *Id.* In analyzing Smith's claim, the High Court initially recognized that "Smith's confrontation claim can succeed only if Rast's statements came into

evidence for their truth[,]" as "the Clause applies solely to testimonial *hearsay*." *Id.* at 792 (emphasis in original). The **Smith** Court explained that "a court analyzing a confrontation claim must identify the role that a given out-of-court statement — here, Rast's statements about her lab work — served at trial." *Id.* at 793. Ultimately, the Court concluded that,

> Rast's statements … came in for their truth, and no less because they were admitted to show the basis of Longoni's expert opinions. All those opinions were predicated on the truth of Rast's factual statements. Longoni could opine that the tested substances were marijuana, methamphetamine, and cannabis only because he accepted the truth of what Rast had reported about her work in the lab — that she had performed certain tests according to certain protocols and gotten certain results. And likewise, the jury could credit Longoni's opinions identifying the substances only because it too accepted the truth of what Rast reported about her lab work (as conveyed by Longoni). If Rast had lied about all those matters, Longoni's expert opinion would have counted for nothing, and the jury would have been in no position to convict. So the State's basis evidence — more precisely, the truth of the statements on which its expert relied — propped up its whole case. But the maker of those statements was not in the courtroom, and Smith could not ask her any questions.

*Id.* at 798. In sum, because "the State used Longoni to relay what Rast wrote down about how she identified the seized substances[,] Longoni thus effectively became Rast's mouthpiece" and his testimony was hearsay. *Id.* at 800.

However, that conclusion did not lead the **Smith** Court to hold that Longoni's testimony violated Smith's Confrontation Clause rights. Instead, the **Smith** Court clarified that,

> [w]hat remains is whether the out-of-court statements Longoni conveyed were **testimonial**. As earlier explained, that question

- 14 -

is independent of everything said above: ***To implicate the Confrontation Clause, a statement must be hearsay ("for the truth") and it must be testimonial—and those two issues are separate from each other.*** The latter, this Court has stated, focuses on the "primary purpose" of the statement, and in particular on how it relates to a future criminal proceeding. A court must therefore identify the out-of-court statement introduced, and must determine, given all the "relevant circumstances," the principal reason it was made.

***Id.*** at 800-01 (cleaned up; emphasis added). In the end, the ***Smith*** Court did not answer the question of whether Longoni's statements were testimonial, as it was not presented in Smith's petition for certiorari, and the Arizona Court of Appeals had also not decided that issue. ***Id.*** at 801. Accordingly, the Court remanded for the state appellate court to rule on the testimonial issue in the first instance. It advised that in doing so, the state appellate court should first determine exactly which of Rast's statements were at issue, and then discern if the "the document's primary purpose" was "a focus on court." ***Id.*** at 802.

Applying ***Smith*** and the cases on which it relies to the instant matter, it is apparent that Appellant only had a Confrontation Clause right to confront the toxicologist who drafted the report relied on by Dr. Kamerow if the report constituted ***testimonial hearsay***.

First, we assess whether the report was hearsay. In regard to this question, the ***Smith*** Court explained:

If an expert for the prosecution conveys an out-of-court statement in support of his opinion, and the statement supports that opinion only if true, then the statement has been offered for the truth of what it asserts. How could it be otherwise? The whole point of the prosecutor's eliciting such a statement is to establish —

*because of the statement's truth* — a basis for the jury to credit the testifying expert's opinion.  Or said a bit differently, the truth of the basis testimony is what makes it useful to the prosecutor; that is what supplies the predicate for — and thus gives value to — the state expert's opinion.  So there is no meaningful distinction between disclosing an out-of-court statement to explain the basis of an expert's opinion and disclosing that statement for its truth.

**Smith**, 602 U.S. at 795 (cleaned up; emphasis in original)

In this case, the toxicologist prepared a report stating, *inter alia*, the amount of Fentanyl determined to be in the victim's blood.  Dr. Kamerow then used that report, **because of its truth**, to opine that the victim died from an overdose of Fentanyl.  More specifically, Dr. Kamerow testified that, after completing an internal and external examination of the victim's body, he was unable to determine the cause of death.  N.T. Trial at 212-13.  When asked what he had used, then, "to come to that determination[,]" he answered, "Toxicology.  I ran the blood and the vitreous [fluid]."  *Id.* at 213.  Dr. Kamerow stated that in the toxicology report he received, "the main finding" was that the victim had a "Fentanyl concentration of 29.5 nanograms per millileter."  *Id.*  The doctor explained that this was "a lethal concentration of Fentanyl."  *Id.*  He also testified that the toxicology report indicated the victim had "a methamphetamine level at 1.5 nanograms per millileter," which "is a very small concentration of methamphetamine."  *Id.* at 214.  Ultimately, Dr. Kamerow concluded that "the Fentanyl concentration in and of itself," independent of any other substances found in the victim's system, was "sufficient … to cause the death" of the victim.  *Id.* at 214-15.  Accordingly,

the doctor opined that the cause of the victim's death was accidental "Fentanyl overdose." *Id.* at 215, 216.

Clearly, Dr. Kamerow's opinion conveyed the toxicology report, and the report supported his opinion *only if it was true* as to the amount of Fentanyl in the victim's blood. Thus, the toxicology report came in for the truth of what it asserted and constituted hearsay. *See Smith*, 602 U.S. at 795.

The next question is whether the toxicology report was testimonial. Again, the *Smith* Court did not address this issue; thus, we are guided primarily by *Melendez-Diaz* and *Bullcoming*. To begin, as discussed *supra*, the *Melendez-Diaz* Court assessed the testimonial nature of "certificates of analysis showing the results of [a] forensic analysis performed on … seized substances" found in "19 small[] plastic bags" that had been seized from Melendez-Diaz. *Melendez-Diaz*, 557 U.S. at 308.

> The certificates reported the weight of the seized bags and stated that the bags "[h]a[ve] been examined with the following results: The substance was found to contain: Cocaine." The certificates were sworn to before a notary public by analysts at the State Laboratory Institute of the Massachusetts Department of Public Health, as required under Massachusetts law.

*Id.*

In concluding the certificates were testimonial, the *Melendez-Diaz* Court explained:

> The documents at issue here, while denominated by Massachusetts law [as] "certificates," are quite plainly affidavits: "declaration[s] of facts written down and sworn to by the declarant before an officer authorized to administer oaths." Black's Law Dictionary 62 (8th ed. 2004). They are incontrovertibly a "'solemn declaration or affirmation made for the

purpose of establishing or proving some fact.'" **Crawford**, **supra**, at 51 … (quoting 2 N. Webster, An American Dictionary of the English Language (1828)).  The fact in question is that the substance found in the possession of Melendez–Diaz and his codefendants was, as the prosecution claimed, cocaine — the precise testimony the analysts would be expected to provide if called at trial.  The "certificates" are functionally identical to live, in-court testimony, doing "precisely what a witness does on direct examination." **Davis**…, 547 U.S. [at] 830 … (emphasis deleted).

Here, moreover, not only were the affidavits "'made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial,'" **Crawford**, **supra**, at 52, … but under Massachusetts law[,] the *sole purpose* of the affidavits was to provide "*prima facie* evidence of the composition, quality, and the net weight" of the analyzed substance, Mass. Gen. Laws, ch. 111, § 13.  We can safely assume that the analysts were aware of the affidavits' evidentiary purpose, since that purpose — as stated in the relevant state-law provision — was reprinted on the affidavits themselves.

*Id.* at 310-11 (some citations omitted; emphasis in original).  Accordingly, the **Melendez-Diaz** Court held that the affidavits were testimonial.

In **Bullcoming**, the Court held that a forensic report containing a certification that Bullcoming's blood alcohol concentration (BAC) was well above the threshold for the offense of driving under the influence of alcohol (DUI) was testimonial and, thus, could not come in through the testimony of a scientist who did not sign the certification, or perform or observe the test reported in the certification.  The Court highlighted that the report set forth information "filled in by [the] arresting officer[,]" including the "reason [the] suspect [was] stopped" and the date and time the blood sample was drawn. **Bullcoming**, 564 U.S. at 653.  "The arresting officer also affirmed that he had arrested Bullcoming and witnessed the blood draw." **Id.**  Additionally,

the report presented the "certificate of analyst," completed and signed by Curtis Caylor, the … forensic analyst assigned to test Bullcoming's blood sample. Caylor recorded that the BAC in Bullcoming's sample was 0.21 grams per hundred milliliters, an inordinately high level. Caylor also affirmed that the seal of the sample was received intact and broken in the laboratory, that the statements in the analyst's block of the report are correct, and that he had followed the procedures set out on the reverse of the report. Those procedures instructed analysts, *inter alia*, to retain the sample container and the raw data from the analysis, and to note any circumstance or condition which might affect the integrity of the sample or otherwise affect the validity of the analysis. Finally, in a block headed "certificate of reviewer," the … examiner who reviewed Caylor's analysis certified that Caylor was qualified to conduct the BAC test, and that the established procedure for handling and analyzing Bullcoming's sample had been followed.

***Id.*** (cleaned up).

The ***Bullcoming*** Court held that the at-issue reports were testimonial, explaining:

> In ***Melendez–Diaz***, a state forensic laboratory, on police request, analyzed seized evidence (plastic bags) and reported the laboratory's analysis to the police (the substance found in the bags contained cocaine). The certificates of analysis prepared by the analysts who tested the evidence in ***Melendez–Diaz***, this Court held, were incontrovertibly affirmations made for the purpose of establishing or proving some fact in a criminal proceeding. The same purpose was served by the certificate in question here.
>
> The State maintains that the affirmations made by analyst Caylor were not adversarial or inquisitorial; instead, they were simply observations of an independent scientist made according to a non-adversarial public duty. That argument fares no better here than it did in ***Melendez–Diaz***. A document created solely for an evidentiary purpose, ***Melendez–Diaz*** clarified, made in aid of a police investigation, ranks as testimonial.
>
> ***
>
> In all material respects, the laboratory report in this case resembles those in ***Melendez–Diaz***. Here, as in ***Melendez–***

*Diaz*, a law-enforcement officer provided seized evidence to a state laboratory required by law to assist in police investigations. Like the analysts in *Melendez–Diaz*, analyst Caylor tested the evidence and prepared a certificate concerning the result of his analysis. Like the *Melendez–Diaz* certificates, Caylor's certificate is formalized in a signed document, headed a report. Noteworthy as well, the [laboratory] report form contains a legend referring to municipal and magistrate courts' rules that provide for the admission of certified blood-alcohol analyses.

In sum, the formalities attending the report of blood alcohol analysis are more than adequate to qualify Caylor's assertions as testimonial. The absence of notarization does not remove his certification from Confrontation Clause governance. The New Mexico Supreme Court, guided by *Melendez–Diaz*, correctly recognized that Caylor's report fell within the core class of testimonial statements described in this Court's leading Confrontation Clause decisions: *Melendez-Diaz*, 557 U.S.[] at 310…; *Davis*, 547 U.S.[] at 830…; [and] *Crawford*, 541 U.S.[] at 51-52….

*Bullcoming*, 564 U.S. at 663-65 (cleaned up).

After carefully considering the instant toxicology report under the guidelines and analysis elucidated by *Melendez-Diaz* and *Bullcoming*, we conclude that the report was not testimonial. Unlike the forensic reports in those cases, the following facts convince us that the toxicology report in this case was *not* created solely for an evidentiary purpose or made to aid a police investigation.

The toxicology testing was done at a laboratory called MolecularDx, LLC. The report states "Confidential" at the top, and lists the victim's name, date of birth, gender, and age. MolecularDx Report, 1/4/22, at 1 (Commonwealth's Exhibit 16). It states the "Ordering Agency/Client" as "Curtis Goldblatt" of

"ForensicsDx" with an address and contact telephone number.[4]  *Id.*  It also states a number assigned by Molecular Dx ("2021-0349"), an agency identification number ("TO2021-0091"), the county ("Clearfield"), the date the samples were received ("12/21/2021"), and the date the results were reported ("1/4/2022").  It then lists, on the same page, the "Analytes" and/or "Drug Names" of substances found in the victim's system, along with the amount (either numerical or the word "Positive"), unit (*i.e.*, "ng/ml"), "ID-Matrix" (*i.e.*, blood or vitreous fluid), and "Method" (*i.e.*, "LC-MS/MS") for each separate analyte or drug.  *Id.*  Under a "Specimens Received" section, it lists the identification numbers of two specimens, the "Matrix" for each as "Blood," the "Source" for each as "Cardiac," the "Tube Type" for each as "Tube – Grey Top," and the "Date/Time Collected" for each as "12/21/2021 05:30."  *Id.*

The next two pages of the toxicology report give "Detailed Drug Information" for each analyte/drug found in the victim's system.  *Id.* at 2-3.  For instance, for Fentanyl, the report states:

> A short duration, high potency synthetic narcotic pain reliever, used clinically as an adjunct to surgical anesthesia or to treat severe or chronic pain.  It is available in a variety of dosage forms,

_____

[4] It is unclear whether Curtis Goldblatt ordered the toxicology report, or if he was involved in conducting the analysis of the samples provided to MolecularDx.  During the hearing on Appellant's motion to suppress the toxicology report, the trial court asked, "So the Toxicology Report analysis was done by Dr. Curtis Goldblatt[?]" to which the Commonwealth responded, "Yes, Yor Honor.  That is what it appears to state there [on the report]."  However, as just stated, the report indicates that Dr. Goldblatt was the "Ordering Agency/Client," and it lists a different individual as the "Analyst" at the end of the report.  *See* MolecularDx Report at 5.  Appellant raises no issue with this vagueness regarding Dr. Goldblatt's role.

such as dermal patches, nasal spray, and sublingual lonzenges. Dose varies widely depending on use, but typically ranges from 0.025-1.6 mg, with mode of administration dictating frequency of dose. The half-life of fentanyl is 3-12 hours. Fentanyl is metabolized to norfentanyl, the primary metabolite. It is believed that the metabolite does not contribute to fentanyl's toxicity. The reported therapeutic, toxic, and lethal blood levels range from 0.3-1.2, 1.6-10, and 2.2-100, respectively.

*Id.* at 2.

The fourth page of the toxicology report indicates the "Tests Ordered," stating that the "Advanced Toxicology Package" was ordered in this case and "covers [more than] 280 illicit and therapeutic drugs and can be used to aid in determination of cause of death where there is suspicion of drug or pharmaceutical toxicity or can be used for clinical purposes." *Id.* at 4. It then lists each of the analytes/drugs for which the victim's blood and vitreous fluid were tested. At the end of the report, it lists the name of the analyst ("Jared McAtee"), and states "Reviews Authorized By: Erin Divito." Finally, the report sets forth the following disclaimer:

This report shall not be reproduced, except in full, without written approval from the laboratory. Results provided only relate to the items tested or sampled and are limited by the condition in which they are received. *All laboratory activity was performed at the listed location and **occurred between the listed dates. Information provided by external agencies, additions to, deviations, or exclusions to the method, or conditions of received specimens that could affect the validity of data will appear as case notes on the report.

*Id.* at 5. There do not appear to be any case notes in the report.

Based on the information set forth in the toxicology report, it does not appear on its face to be testimonial. Aside from the report's indicating that

Dr. Goldblatt is from "ForensicDx," there is nothing suggesting to the analyst who prepared the report that it was being requested as part of a criminal investigation. For instance, there was nothing indicating the blood samples were "seized evidence" as in **Melandez-Diaz** and **Bullcoming**, and there were no procedural formalities attending the report to suggest that it was produced to be used in litigation, such as its being notarized, signed, or referencing chain of custody and/or rules for its admission in court. **See also Commonwealth v. Yohe**, 79 A.3d 520, 554 (Pa. 2013) (concluding a toxicology report identifying the BAC of Yohe's blood was testimonial, as its purpose was to address the issue of whether Yohe was DUI, it "was plainly created for an 'evidentiary purpose[,]'" and it was "made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial"). Additionally, there were no "certificate of analysis" stating any conclusions regarding the results of the toxicology tests, and no effort was made to describe the testing procedures or qualifications of the analyst.

Moreover, the circumstances surrounding the ordering of the toxicology report also convince us that it was not drafted for the primary purpose of being used in court. **See Smith**, 602 U.S. at 802. First, Dr. Kamerow testified that the toxicology tests were ordered for the purpose of **establishing the victim's cause of death**; nothing in his testimony indicates that he ordered the tests to discern whether a crime had occurred, or to serve as evidence in a future trial. **See** N.T. Trial at 213 (Dr. Kamerow's testifying that because

he was unable to determine the victim's cause of death based on his external and internal examination of her body, he ordered toxicology testing of "the blood and vitreous" fluid to make this determination).

Second, Appellant does not argue – or cite any evidence to support – that Dr. Kamerow or the toxicologist knew, or had any reason to believe, that a criminal investigation was ongoing, or even anticipated, at the time the toxicology report was ordered and prepared. In fact, as Appellant readily points out, he "was not arrested until over a year after" the victim's death, and he was "not tried until nearly two years" later. Appellant's Brief at 36. This timeline indicates there was no investigation or thought of criminal prosecution until well after the toxicology report was created in this case.

It would also not have been reasonable for Dr. Kamerow or the toxicologist to **presume** a criminal investigation was, or would be, underway and to prepare the report for the primary purpose of a trial. When a person dies from overdosing an illegal narcotic, it is not always indicative of a prosecutable act by another person, as the deceased individual could have manufactured and ingested the illegal narcotics wholly on their own. The only criminal conduct in such a scenario would be by the victim themselves; thus, a toxicology report to discern how the victim died would not be made for the purpose of court. These circumstances distinguish the toxicology report in the instant case from the forensic tests and reports at issue in **Melendez-Diaz** and **Bullcoming**, which clearly were done for the purpose of establishing criminality. In those cases, there would be no other reason to conduct tests

of substances suspected to be narcotics, or the blood of a living person to discern its alcohol content, except for purposes of investigating a crime and/or to use in a future criminal trial. Thus, the analysts who prepared the reports in those cases knew, or should have known, that their primary purpose was for use in a future trial.

The same is not true of the toxicology report in the instant case. The record before us demonstrates that the toxicology report was created for the primary purpose of establishing the victim's cause of death; it was **not** made to prove some fact in a criminal proceeding, to serve an evidentiary purpose, or to aid in a police investigation. Additionally, the report was not drafted under circumstances that would lead an objective witness to reasonably conclude that it would be used later at trial. Consequently, the toxicology report in this case is distinguishable from the forensic documents at issue in **Melendez-Diaz** and **Bullcoming**, and we conclude that it was not testimonial.[5] As such, the trial court's admission of Dr. Kamerow's testimony

_____

[5] Appellant's assertions in a post-argument submission that was accepted by this Court do not change our conclusion. Therein, Appellant contends that the toxicology tests were ordered based on Dr. Kamerow's clinical history, which stated: "The male reports that the line disappeared and he found the [victim] unresponsive." N.T. Trial at 220. Based on this statement in Dr. Kamerow's clinical history, Appellant insists that "the primary purpose for the blood draw and autopsy was to determine whether there was in fact criminality because of the statements made by [Appellant] about a 'line' of [F]entanyl/heroin being placed on a cigar box by [Appellant], which had disappeared[,] and whether that line was the cause and manner of death." Post-Argument Submission, 6/11/25, at unnumbered 2 ¶ 7. We disagree. First, the at-issue statement by Appellant does not even indicate that **he gave** the victim the
*(Footnote Continued Next Page)*

about the report, without the toxicologist being present for Appellant to cross-examine, did not violate Appellant's constitutional rights.

## Third Issue

In Appellant's third issue, he contends that the court erred by not instructing the jury "that the toxicology report could not be received as substantive evidence." Appellant's Brief at 29-30. Appellant relies on the following language from the comment of Rule 703 to support his position:

> When an expert testifies about the underlying facts and data that support the expert's opinion and the evidence would be otherwise inadmissible, the trial judge upon request must, or on the judge's own initiative may, instruct the jury to consider the facts and data only to explain the basis for the expert's opinion, and not as substantive evidence.

---

line of drugs that 'disappeared' before he found the victim 'unresponsive,' so as to support his current suggestion that he was a suspect in a criminal investigation at the time the autopsy and toxicology tests were ordered. Second, the fact that Dr. Kamerow knew, based on statements by Appellant at the scene of the victim's death, that she had likely ingested drugs does not mean that the doctor ordered the toxicology tests for the primary purpose of aiding in a criminal investigation, or to produce evidence to be used at trial. Notably, the doctor explained that Appellant's statement that the line of drugs disappeared before he found the victim unconscious, combined with the doctor's physical examination of the victim's body, "**suggest[ed]** that the [victim] experienced a rapid reaction … to … narcotics[,] and … she [succumbed] to the narcotics without the time left to develop pulmonary congestion, pulmonary edema, [or] froth in the tracheal and bronchial tree." N.T. Trial at 220 (emphasis added). Despite these factors indicating the victim died of a drug overdose, Dr. Kamerow could not definitively determine the victim's cause and/or manner of death based only on his physical examination of her body and information he had about the incident. **See id.** at 213. Consequently, the doctor ordered the toxicology report for the **primary purpose** of establishing the victim's cause and manner of death, not to create evidence that would be later used at trial.

Pa.R.E. 703 Cmnt. According to Appellant, he requested this instruction, but the trial court erroneously denied his request. Appellant insists that this error further "compounded" the court's ostensible error of permitting Dr. Kamerow "to opine as to [the victim's] cause of death" without Appellant's being able to cross-examine the toxicologist. Appellant's Brief at 29.

In response, the Commonwealth first contends that Appellant has waived this issue, as "he did not object to the trial court['s] omitting that instruction." Commonwealth's Brief at 12. According to the Commonwealth, "[n]o objections were raised during the discussion between the trial court and counsel and[,] likewise, none were raised following the close of the jury instructions." *Id.* Thus, the Commonwealth concludes that Appellant's challenge to the court's refusal to provide the at-issue jury instruction was waived. *Id.* (citing *Commonwealth v. Janda*, 14 A.3d 147, 163 (Pa. Super. 2011) (holding that Janda waived his challenge to the omission of a jury instruction where he requested the instruction, "but did not lodge an objection after the trial court omitted [it] from the charge")); *see also* Pa.R.Crim.P. 647(B) (stating that "[n]o portions of the charge nor omissions from the charge may be assigned as error, unless specific objections are made thereto before the jury retires to deliberate").

In Appellant's reply brief, he insists that his jury-instruction issue is not waived, based on the following discussion after the court's charge to the jury:

> THE COURT: Okay. Turning to counsel, [the Commonwealth,] is there anything else that you think I should charge?

[The Commonwealth]: No, Your Honor.  Nothing from the Commonwealth.

THE COURT: [Defense counsel]?

[Defense counsel]: No, Your Honor.

THE COURT: Okay.  And I understand, for purposes of the defense, anything that there has been previously … an issue [with] or objection to stands.  It is already a part of the record.  Okay.  So [Commonwealth,] at least up to this point, any exceptions?

[The Commonwealth]: No exceptions, Your Honor.

THE COURT: [Defense counsel,] again, subject to anything that is previously of record?

[Defense counsel]: No.  No further exceptions.

N.T. Trial at 340-41.

According to Appellant, the comments by the court make clear that

it was [the trial court's] practice to incorporate ***previous objections*** that were made on the record to remain after the [c]ourt concluded its jury charge.  Therefore, given this practice, there were objections made at the end of the court's charge which the lower court incorporated into the record to preserve the objection.  The spirit of [Rule] 647(B) was followed.  Therefore, the Commonwealth's argument regarding waiver should be rejected.

Appellant's Reply Brief at 8 (emphasis added).

Notably, Appellant does not point to where in the record he made any ***objection*** to the court's decision not to provide the at-issue jury charge.  In his brief, he cites to where the trial court and counsel discussed his ***request*** to give a jury instruction, in line with the comment to Rule 703, that the jury could not consider the toxicology report as substantive evidence.  ***See*** Appellant's Brief at 29 (citing N.T. Trial at 191-93; 263-71).  However, when the court decided not to provide the requested instruction, reasoning that it

- 28 -

was extremely confusing and might cause the jury to believe that it had to disregard Dr. Kamerow's testimony as a whole, Appellant did not lodge any specific objection to the court's decision. **See** N.T. Trial at 268 (stating that if the court read Appellant's proposed charge, it would essentially be "telling the jury to disregard Dr. Kamerow's opinion that the amount of Fetanyl [*sic*] in the victim's blood stream was the cause of death"); **id.** at 271 (the court's ruling that it was "going to deny [Appellant's] request" to give the charge, and defense counsel's responding, "Thank you, Your Honor"). Thus, even if Appellant is correct that the court's statements after instructing the jury incorporated any "previous **objections**," Appellant's Reply Brief at 8 (emphasis added), there is nothing in the portions of the record he cites demonstrating that he actually lodged an objection to the court's decision not to give his proposed instruction. Accordingly, we agree with the Commonwealth that this issue has been waived.

Notwithstanding the finding of waiver, we would also agree with the Commonwealth that the trial court did not abuse its discretion by refusing to provide Appellant's requested jury charge and, even if that decision was improper, it was harmless error. First, we recognize that,

> [w]hen reviewing a challenge to jury instructions, the reviewing court must consider the charge as a whole to determine if the charge was inadequate, erroneous, or prejudicial. The trial court has broad discretion in phrasing its instructions, and may choose its own wording so long as the law is clearly, adequately, and accurately presented to the jury for its consideration. A new trial is required on account of an erroneous jury instruction only if the instruction under review contained fundamental error, misled, or confused the jury.

***Commonwealth v. McRae***, 5 A.3d 425, 430–31 (Pa. Super. 2010) (citation omitted).

Here, Appellant requested the following jury charge:

An expert may base his opinion on facts or data in the case that the expert has been made aware of or personally observed. If experts in a particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted; however, the facts and the data that the expert relies on can be considered only to explain the basis for the expert's opinion and not as substantive evidence.

In this case, Dr. Harry Kamerow testified as an expert for the Commonwealth. Dr. Kamerow's report contained a Toxicology Report which is inadmissible in this case. As to Dr. Kamerow's testimony regarding toxicology results contained in said Toxicology Report and Autopsy Report, you may not consider the testimony as to toxicology results or opinions as substantive evidence in this case. You may not consider toxicology results as evidence in this case tending to prove or disprove any element of the offenses charged but only consider them as the basis for the expert's testimony.

N.T. Trial at 267-68.

The trial court found the proposed instruction to be "incredibly confusing." ***Id.*** at 271. Notably, when the court expressed its concern that the jury could interpret the charge as meaning it should "disregard Dr. Kamerow's opinion that the amount of Fentanyl in the victim's blood stream was the cause of death[,]" Appellant's counsel answered, "Correct." ***Id.*** at 268. In other words, Appellant's counsel acknowledged that the proposed instruction could confuse the jury and cause them not to consider Dr. Kamerow's admissible opinion testimony that the victim died from a Fentanyl

- 30 -

overdose. Given this record, we would discern no abuse of discretion in the court's decision not to provide Appellant's requested jury instruction.

Moreover, we would also conclude that any error in declining to provide that instruction was harmless. This Court has stated:

> If we conclude that a charge is erroneous, we will grant a new trial unless the error is deemed harmless. An error is deemed harmless only if the appellate court is convinced beyond a reasonable doubt that the error is harmless. Moreover, a jury instruction will be upheld if it adequately and accurately reflects the law and is sufficient to guide the jury through its deliberations.

*Commonwealth v. Dietterick*, 631 A.2d 1347, 1352 (Pa. Super. 1993) (citations omitted).

Here, the Commonwealth maintains that the omission of the instruction that the jury could not consider the toxicology report as substantive evidence was harmless because "the instruction likely would not have been a tipping point for the jurors." Commonwealth's Brief at 14. Given our decision, *supra*, that Dr. Kamerow's testimony about the toxicology report was properly admitted, we agree. Dr. Kamerow explained that, based on the amount of Fentanyl in the victim's blood, as set forth in the toxicology report, the victim's cause of death was an accidental Fentanyl overdose. The jury was permitted to consider, as substantive evidence, the doctor's expert opinion as to the victim's cause of death. Thus, even if the jury was instructed that they could not consider, as substantive evidence, the toxicology report itself — and they understood and properly applied that jury charge — it would not have changed the outcome of Appellant's trial in light of Dr. Kamerow's expert testimony

regarding the victim's cause of death. Thus, Appellant's third issue does not warrant relief.

**Fourth Issue**

Finally, in Appellant's fourth issue, he challenges the discretionary aspects of his sentence. Specifically, Appellant argues that the court considered an improper sentencing factor, believing incorrectly that Appellant's DDRD offense required a five-year mandatory sentence. He also claims that the court failed to state any reasons on the record for imposing his sentence, and that it did not adequately take into account various mitigating factors raised by Appellant.

We begin by noting that,

[c]hallenges to the discretionary aspects of sentencing do not entitle an appellant to review as of right. ***Commonwealth v. Sierra***, 752 A.2d 910, 912 (Pa. Super. 2000). An appellant challenging the discretionary aspects of his sentence must invoke this Court's jurisdiction by satisfying a four-part test:

We conduct a four-part analysis to determine: (1) whether [the] appellant has filed a timely notice of appeal, ***see*** Pa.R.A.P. 902 and 903; (2) whether the issue was properly preserved at sentencing or in a motion to reconsider and modify sentence, ***see*** Pa.R.Crim.P. 720; (3) whether [the] appellant's brief has a fatal defect, Pa.R.A.P. 2119(f); and (4) whether there is a substantial question that the sentence appealed from is not appropriate under the Sentencing Code, 42 Pa.C.S.[] § 9781(b).

***Commonwealth v. Evans***, 901 A.2d 528, 533 (Pa. Super. 2006)…. Objections to the discretionary aspects of a sentence are generally waived if they are not raised at the sentencing hearing or in a motion to modify the sentence imposed. ***Commonwealth v. Mann***, 820 A.2d 788, 794 (Pa. Super. 2003)….

> The determination of what constitutes a substantial question must be evaluated on a case-by-case basis. ***Commonwealth v. Paul***, 925 A.2d 825, 828 (Pa. Super. 2007). A substantial question exists "only when the appellant advances a colorable argument that the sentencing judge's actions were either: (1) inconsistent with a specific provision of the Sentencing Code; or (2) contrary to the fundamental norms which underlie the sentencing process." ***Sierra***, ***supra*** at 912–13.

***Commonwealth v. Griffin***, 65 A.3d 932, 935 (Pa. Super. 2013) (quoting

***Commonwealth v. Moury***, 992 A.2d 162, 170 (Pa. Super. 2010)).

Here, Appellant filed a timely notice of appeal. However, we agree with the Commonwealth that Appellant failed to raise his sentencing claims in a post-sentence motion. Appellant filed a post-sentence motion on February 22, 2024, raising various claims, but making no mention of any challenge to his sentence. The Commonwealth also filed a post-sentence motion, asking the court to reconsider sentencing Appellant to the term of 20 to 40 years' incarceration the Commonwealth had requested. On April 8, 2024, the court conducted a brief hearing on the parties' post-sentence motions, simply directing the parties to file briefs explaining their post-sentence issues. On May 17, 2024, Appellant filed a motion for an extension of time to file his brief. The court granted that motion on May 22, 2024. Yet, there is no indication on the docket that Appellant filed any post-sentence brief.[6] On July 10, 2024,

_____

[6] Although in Appellant's reply brief, he claims that his sentencing "issues were raised in the Memorandum in Support of the Post[-]sentence Motion[,]" there is no docket entry for any such memorandum, and Appellant does not point to where in the record that document can be found. *See* Pa.R.A.P. 2119(c) ("If reference is made to … any … matter appearing in the record, the argument must set forth … a reference to the place in the record where the matter referred to appears.").

the court issued an order dismissing Appellant's post-sentence motion, and denying the Commonwealth's post-sentence motion. In the trial court's Rule 1925(a) opinion, it states that Appellant's claims that his sentence is excessive, and that the court "relied upon impermissible factors," were "not raised in the Post[-]Sentence Motions." TCO at 9.

Based on this record, we agree with the trial court and the Commonwealth that Appellant failed to preserve his sentencing claims in his post-sentence motion. *See* Pa.R.A.P. 302(a) ("Issues not raised in the trial court are waived and cannot be raised for the first time on appeal."); *Griffin*, 65 A.3d at 936 ("[I]ssues challenging the discretionary aspects of a sentence must be raised in a post-sentence motion or by presenting the claim to the trial court during the sentencing proceedings. Absent such efforts, an objection to a discretionary aspect of a sentence is waived.") (citation omitted). Thus, no relief is due on Appellant's fourth and final issue.

Judgment of sentence affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

DATE: 07/10/2025

- 34 -